T.C. Memo. 1995-511


UNITED STATES TAX COURT


WILLIAM C. AND ELAINE GASKINS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PASQUALE T. QUINN AND SABINA A. QUINN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 8509-91, 8539-91.  Filed October 26, 1995.

James J. Riley, for petitioners.

Keith L. Gorman, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARKER, Judge: Respondent determined deficiencies in
Federal income tax for petitioners William C. and Elaine Gaskins
and additions to tax for fraud under section 6653(b) for William
C. Gaskins as follows:

| Taxable Year | Deficiency | Addition to Tax Sec. 6653(b) |
|---|---|---|
| 1979 | $16,925 | $8,463 |
| 1980 | 21,628 | 10,814 |
| 1981 | 80,794 | 40,397 |

Respondent determined deficiencies in Federal income tax for petitioners Pasquale T. and Sabina A. Quinn and additions to tax for fraud under section 6653(b) for Pasquale T. Quinn as follows:

| Taxable Year | Deficiency | Addition to Tax Sec. 6653(b) |
|---|---|---|
| 1979 | $20,766 | $10,383 |
| 1980 | 25,591 | 12,796 |
| 1981 | 88,322 | 44,161 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues remaining for decision are (1) Whether petitioner Elaine Gaskins is entitled to relief as an innocent spouse under section 6013(e), and (2) whether petitioner Sabina A. Quinn is entitled to relief as an innocent spouse under section 6013(e).

---

[1]Petitioners William C. Gaskins and Pasquale T. Quinn conceded they are liable for their respective deficiencies for taxable years 1979, 1980, and 1981 and for the additions to tax under sec. 6653(b) for taxable years 1979 and 1980. Respondent conceded petitioners William C. Gaskins and Pasquale T. Quinn are not liable for the sec. 6653(b) addition for taxable year 1981.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

Petitioners William C. and Elaine Gaskins (the Gaskins) and petitioners Pasquale T. and Sabina A. Quinn (the Quinns) resided in Minersville, Pennsylvania, at the time they filed their respective petitions. Their cases have been consolidated for trial, briefing, and opinion.

### Petitioners' Business Activities

Prior to 1968, William C. Gaskins (Mr. Gaskins) worked as a roofer in the Philadelphia and Delaware area. While working in Philadelphia for the roofers' union, Mr. Gaskins worked for a John McCullough. From 1968 until 1975 or 1976, Mr. Gaskins owned and operated his own roofing business known as Minersville Roofing and Sheet Metal Company (the first roofing company).[2] The business address was 142 Sunbury Street, Minersville, Pennsylvania. Pasquale T. Quinn (Mr. Quinn) worked for the first roofing company. This company fell behind in its payments of withheld employment taxes to the Internal Revenue Service (IRS). Mr. Gaskins was also the subject of a criminal investigation with respect to these employment taxes but was never charged.

---

[2]Paragraph 13 of the parties' stipulation of facts contains an incorrect name for this first roofing company. The Court relies upon Mrs. Gaskins' testimony as to the correct name of the first company.

The IRS ultimately assessed a responsible officer penalty under section 6672 (the 100-percent penalty) against Mr. Gaskins for this delinquency. Tax lines were filed against Mr. Gaskins. Eugene Clark (Mr. Clark) was the IRS revenue officer responsible for, collecting this penalty. Mr. Gaskins failed to pay the taxes, and the first roofing company went out of business.

In 1975 or 1976, the Gaskins organized, and Mr. Gaskins ran, Minersville Roofing and Siding Company (the second roofing company). Due to the unpaid debts of the first roofing company, the Gaskins incorporated the second roofing company in Mrs. Gaskins' name. Mr. Gaskins, using the equipment from the first company, performed the jobs he had already arranged and, thereby, continued in the roofing business. Mr. Gaskins listed Mrs. Gaskins as president of the second roofing company. While he had not asked her permission to list her as an officer, he informed her he was going to do this. Mrs. Gaskins was at all times aware that she was at least nominally the president of the second roofing company.

The second roofing company employed the same secretary who had worked for the first roofing company. Mrs. Gaskins occasionally assisted her with the secretarial work. The secretary paid the company bills, but Mrs. Gaskins sometimes made bank deposits. In the late 1970's, the second roofing company also became delinquent in remitting its withheld employment taxes. The IRS contacted the second roofing company,

and asked for Mrs. Gaskins, since she was listed as that company's president. The 100-percent penalty was ultimately assessed against Mrs. Gaskins in 1979 or 1980. Mrs. Gaskins made monthly payments of about $100 on these taxes, making the payments either" in person at the IRS office in Pottsville, Pennsylvania, or by mail, in the period from about 1979 through late 1981 or early 1982. Finally, equipment of the second roofing company was-sold to pay off the employment taxes. Mr. Clark was the revenue officer responsible for collecting this penalty. The penalty was ultimately paid in full. The second roofing company operated until late 1981 or early 1982.

In the latter part of 1975, Mr. Gaskins and Mr. Quinn had organized West Pine Construction Company (West Pine). Initially, half of the stock was placed in Mr. Quinn's name and the other half in Mrs. Gaskins' name. West Pine was involved in stripmining anthracite coal. West Pine opened a bank account at the Citizens' National Bank of Ashland on September 26, 1975, with a deposit of $9,674.96. The signature card contained the signatures of Benjamin Greenberg, Francis McCullough, Charles Wertz, and Mr. Quinn. Mr. Quinn served as the secretary of West Pine. Mr. Quinn's home functioned as West Pine's office, although he did not even have a desk there. For some period West Pine used a Post Office Box address.

In 1979, through the efforts of John McCullough, other persons invested in West Pine. Oscar Glassman invested about

$120,000 and Joseph Crosley about $60,000. Individuals who each invested approximately $1,800 were Herbert Fisher, Charles Conwell, Thomas Walsh, John McCullough, and possibly Benjamin Greenberg. Herbert Fisher was an attorney in Philadelphia. West Pine entered into various leases to obtain mining rights. One lease, dated July 21, 1979, was signed in the names of Mrs. Gaskins as president and Mr. Quinn as secretary. Two leases, dated January 9, 1981, and June 10, 1981, were signed in the names of Mr. Gaskins as president of West Pine and Mr. Quinn as secretary. A Judgment Note in the amount of $15,000 and an accompanying letter, both dated August 25, 1981, were signed in the names of Mr. Quinn as secretary and Mrs. Gaskins as assistant secretary.

Mr. Quinn signed and filed Federal corporate income tax returns for West Pine for the relevant periods. Mr. Quinn signed checks for West Pine and kept the checkbook. He would write out checks at his kitchen table. At some point Mr. Quinn lost his eyeglasses, and Mrs. Quinn would assist him by writing out the checks under Mr. Quinn's direction, which Mr. Quinn would then sign. Sometimes, Mr. Quinn would borrow his wife's glasses so that he could write out the checks himself.

For some period, Mrs. Gaskins had signatory authority over the West Pine bank account. Beginning in December of 1979, Mrs. Gaskins' name appears along with Mr. Quinn's name as signers(drawers, not endorsers) of West Pine checks. In most

instances, Mr. Quinn signed Mrs. Gaskins' name as the drawer of these checks. Mr. Gaskins had given Mr. Quinn permission to sign Mrs. Gaskins' name. Mr. Quinn and Mrs. Gaskins never discussed this arrangement, but she was aware that he was signing her name on the checks. Prior to the time in December of 1979 when Mrs. Gaskins' name first appears on West Pine checks, Mr. Quinn had signed the name of-William Devers (Mr. Devers) to the West Pine checks, with Mr. Devers' permission. Mr. Devers had worked with Mr. Gaskins, earlier when the latter was a roofer in Philadelphia and Delaware. Mr. Devers also worked at West Pine.

Mr. Gaskins and Mr. Quinn were generally compensated for their work on a weekly basis. However, sometimes their paychecks were delayed or at least were not turned over to their wives in a timely manner. Mr. Gaskins and Mr. Quinn each received a $100 per-week expense allowance from West Pine; these expense checks were issued to Mr. Gaskins, Mr. Quinn, or "Cash". On a few occasions during the years at issue, Mrs. Gaskins received checks from West Pine in reimbursement for business telephone calls made from her home.

Some of the investors, Messrs. Crosley, Walsh, and McCullough, received paychecks, even though they did not perform any services for West Pine. Messrs. Crosley and Walsh also received $100 expense checks. West Pine also leased Lincoln Continental automobiles for Messrs. Crosley, Walsh, Conwell, Gaskins, and Quinn. During the years in issue, Messrs. Gaskins

and Quinn drove these Lincoln Continental automobiles. Mr. Quinn paid the automobile leases and insurance from the West Pine checking account. John McCullough had asked Mr. Quinn to put Messrs. Crosley and Walsh on the payroll and to pay the other expenses as a favor to him for having found the investors. Once or twice, Mr. Quinn wrote a West Pine check to Mr. Conwell to cover the latter's personal telephone bill. Substantial amounts of personal or nonbusiness expenses were paid out of the West Pine checking account.

West Pine regularly was delinquent in the payment of its quarterly Federal employment taxes. Beginning in March or April of 1980 until November of 1981, Mr. Clark was the revenue office responsible for monitoring West Pine's Federal employment tax deposits. When West Pine's employment tax returns were late, Mr. Clark would regularly summons the records necessary to prepare those returns. Mr. Clark met with Mr. Quinn on numerous occasions to prepare West Pine's employment tax returns.

In early 1982, IRS revenue officer John Higgins (Mr. Higgins) took over the West Pine account. On September 9, 1982, Mr. Higgins interviewed Mr. Quinn with regard to the 100-percent penalty for West Pine's employment taxes. During that interview, Mr. Quinn indicated that the officers of West Pine had been: Mrs. Gaskins, president, 1975 to 1979; Oscar Glassman, president, 1979 to June or July 1982; Mr. Quinn, secretary, 1975 to June or July 1982; and Joseph Crosley, vice president, 1979

to June or July 1982.

In February of 1982, West Pine had filed a petition for bankruptcy protection. The amended disclosure statement filed in the bankruptcy court on September 20, 1982, listed the shareholders of West Pine's common stock as: John McCullough (then deceased) and his widow (13 percent), Thomas Walsh and Kathleen Walsh (12 percent), Joseph Crosley and Marie Crosley (12 percent), the Quinns (13 percent), the Gaskins (13 percent), Oscar and Lillian Glassman (20 percent), Charles T. Conwell (12 percent), and Herbert Fisher (5 percent). All of the shares except those belonging to the Glassmans and the Crosleys were pledged as security for loans from Oscar Glassman and Joseph Crosley of $144,000 and $40,000, respectively. The amended disclosure statement listed West Pine's officers as: Mr. Gaskins, acting president; Mr. Quinn, acting secretary; Thomas Walsh, acting treasurer; Joseph Crosley, acting vice president; and Charles Conwell, acting assistant vice president; Mrs. Gaskins was not listed as an officer.

Following a criminal investigation, Mr. Gaskins and Mr.Quinn were charged with diverting receipts belonging to West Pine.[3]  Mr. Gaskins and Mr. Quinn were convicted of Federal

---

[3]Petitioners William C. Gaskins and Pasquale T. Quinn have conceded in this case that they received receipts nor whether the diverted receipts included the rental of the Lincoln Continental automobiles and the payment of personal or nonbusiness expenses out of the corporate bank account.

income tax evasion under section 7201, filing a false return under section 7206(1), and conspiracy under 18 U.S.C. section 371 for the taxable year 1980. They were acquitted of the same charges for the years 1979 and 1981.

Respondent determined that Mr. Gaskins and Mr. Quinn each had diverted receipts from West Pine in the amounts of $46,891, $52,819, and $154,630 for 1979, 1980, and 1981, respectively, and adjusted the Gaskins' and the Quinns' incomes as reported on their Federal individual income tax returns upwards accordingly. See supra note 3. Both the Gaskins and the Quinns filed joint Federal income tax returns for these years and, therefore, respondent, in the notices of deficiency, determined the resulting deficiencies against Mr. and Mrs. Gaskins jointly and against Mr. and Mrs. Quinn jointly. However, the additions to tax for fraud were determined only against Mr. Gaskins and Mr. Quinn. Mr. Gaskins and Mr. Quinn have conceded the deficiencies for all 3 years and the additions to tax for fraud for 1979 and 1980; respondent has conceded the addition to tax for fraud for 1981. Mrs. Gaskins and Mrs. Quinn seek relief in this Court from these deficiencies as innocent spouses under section 6013(e) for all 3 years.

Petitioner Elaine Gaskins

Background

Mrs. Gaskins was born on October 20, 1943. She graduated from high school in 1961; she received no further formal

education or training. The Gaskins were married on April 27, 1968, and, as of the date of the trial, remained married. Prior to her marriage and for 6 months after her marriage, Mrs. Gaskins worked as a secretary. Thereafter, she worked as a receptionist for a doctor until March of 1973, when her first daughter, Rochelle, was born. The Gaskins have two daughters, Rochelle and Sharon. From 1973 until 1985, Mrs. Gaskins' primary occupation was that of a homemaker. During the years the second roofing company was in operation, she assisted Mr. Gaskins to the limited extent as described earlier.

In 1985, Mrs. Gaskins took a job as cafeteria worker in the Minersville area school district, which paid between $3.35 and $3.85 per hour, with no employee benefits. She quit this job in June of 1990. In May of 1992, she began a secretarial job in the Domestic Relations Office located at the Schuylkill County Courthouse in Pottsville, Pennsylvania. This job paid $8.05 per hour and offered medical benefits for her family. Mrs. Gaskins has also done some freelance work for a local newspaper, receiving from $20 to $40 per month for articles she submitted.

Financial Responsibilities

Mrs. Gaskins always took care of the family finances, endorsing and depositing Mr. Gaskins' paychecks into her checking account or cashing them, and using the funds to pay the family's bills. Mrs. Gaskins endorsed and deposited many of the

expense checks Mr. Gaskins received from West Pine from June of 1979 through September of 1981. When the Gaskins were first married, they had a joint checking account; a year or two later, this was changed into Mrs. Gaskins' name only, since she paid all the bills. To Mrs. Gaskins' knowledge, Mr. Gaskins did not have a checking account or other bank accounts thereafter. For a short time in the late 1960's, the Gaskins had had a savings account containing approximately $800 received as wedding gifts. As far as Mrs. Gaskins knew, the Gaskins had no other bank accounts between 1972 and 1981. For the years at issue, Mrs. Gaskins did not prepare the Gaskins' Federal individual income tax returns, but she assembled the information for preparation of the returns and met with the tax return preparer.

### Prior Tax Liabilities

Mrs. Gaskins first learned of the employment tax problems with the first roofing company in 1975 or 1976 when the Gaskins incorporated the second roofing company. Mrs. Gaskins then learned that Mr. Gaskins had received letters from the IRS, mailed to the first roofing company's office, requesting payment of these taxes.

Mr. Gaskins also had problems with his individual Federal tax returns for taxable years 1970 through 1974. The IRS assessed a fraud penalty against Mr. Gaskins with respect to his individual tax deficiencies. Beginning in late December of 1981 through May of 1982, the IRS sent several notices to Mr. Gaskins

regarding his individual income taxes for those earlier years. Mrs. Gaskins knew that tax lines were placed against Mr. Gaskins. Mrs. Gaskins, however, believed Mr. Gaskins' tax liabilities stemmed from his failure to pay over the first roofing company's employment tax withholdings. She was not aware that Mr. Gaskins had problems with his individual income taxes for 1970-1974. However, Mrs. Gaskins was aware of the IRS criminal investigation into the first roofing company.

Mrs. Gaskins learned of the second roofing company's failure to pay employment taxes when the secretary informed Mrs. Gaskins that the IRS had called the office asking for Mrs. Gaskins. The IRS ultimately assessed a 100-percent penalty against Mrs. Gaskins for-this employment tax liability.

Mrs. Gaskins' Knowledge of West Pine's Operations

Mrs. Gaskins did not know who incorporated West Pine. She never attended any shareholder meetings. She only visited a West Pine work site on one occasion, in the company of Mr. Gaskins and their children so the children could see where their father worked. Mrs. Gaskins never performed any duties for West Pine. Mrs. Gaskins was not aware of West Pine's suppliers or customers.

Mr. Gaskins had told Mrs. Gaskins that he wanted her to be listed as president of West Pine, and that her name would be used to sign checks since he could not sign anything. Mr. Gaskins had also told Mrs. Gaskins he had given Mr. Quinn

permission to sign her name to the West Pine checks. Mrs. Gaskins believed that it was Mr. Quinn who was signing her name to West Pine checks. Mrs. Gaskins permitted this practice, accepting the explanation that he did not know anything about the business, Mr. Quinn had the checkbook and was at the work site, and this arrangement was more convenient. Mrs. Gaskins knew Mr. Quinn was an officer of West Pine, the treasurer she thought.

During the years 1979 through 1981, Mrs. Gaskins suspected that West Pine had financial problems when Mr. Gaskins did not give his paycheck to her at regular intervals. Mrs. Gaskins had no knowledge of any unreported income which Mr. Gaskins received from West Pine. See supra note 3.

Every 3 or 4 months, Mrs. Gaskins would make payments on her 100-percent-penalty for the second roofing company in person at the Pottsville IRS office. Occasionally, Mrs. Gaskins would bring in information on Mr. Gaskins' 100-percent penalty for the first roofing company. During Mrs. Gaskins' visits to the Pottsville IRS office, she was distressed that she had been assessed the 100-percent penalty, and Mr. Clark explained the responsible person penalty to her. In her conversations with Mr. Clark, Mrs. Gaskins denied she had any position or capacity with West Pine.

In the latter half of 1981, Mr. Clark came into possession of copies of some of West Pine's checks and bank signature

cards. He then met with Mrs. Gaskins about these items, told her of West Pine's delinquent employment taxes, and advised her of her potential liability. Mr. Clark showed Mrs. Gaskins the West Pine checks and asked her about her signatures on the front of those checks. Mrs. Gaskins told him that Mr. Quinn had signed her name to the West Pine checks. In response to her concern about the potential for another 100-percent-penalty assessment, Mr. Clark advised her to get an affidavit from Mr. Quinn confirming that Mr. Quinn had signed her name and to have her name removed from the bank signature cards. On a subsequent visit in late 1981, Mrs. Gaskins told Mr. Clark that she could not do that since she had signed the checks. In 1982, after the Gaskins' 1981 individual return had been filed, Mrs. Gaskins contacted the family's tax return preparer for advice regarding West Pine's tax problems. The tax return preparer declined to get involved or offer assistance. Mrs. Gaskins understood from Mr. Gaskins that West Pine's tax liabilities and other bills were discussed at meetings held in Philadelphia, meetings that she did not attend.

On September 14, 1982, IRS Revenue Officer Higgins interviewed Mrs. Gaskins relative to the recommendation for a 100-percent-penalty assessment with respect to West Pine's employment tax liability. During this interview, Mrs. Gaskins stated that while she was not an officer of West Pine, she may have been listed as comptroller. At trial, Mrs. Gaskins

testified that she was listed as West Pine's president, not at the time of West Pine's incorporation, but closer to the time West Pine ceased operating. Mrs. Gaskins explained the apparent discrepancy in her answers by stating that in 1982, she did not know whether she actually had been listed as president. Mrs. Gaskins further explained that she answered Mr. Higgin's questions based on information given to her by Mr. Gaskins in anticipation of that interview. Mrs. Gaskins did not distrust her husband, and she simply repeated what he had told her.

### House, Mortgages, and Related Expenses

The Gaskins live in a three-bedroom ranch house, where they have resided since July of 1972. They obtained their first mortgage on the house from State Capital Savings and Loan in the principal amount of $21,800. In January of 1978, the Gaskins obtained a $5,000 loan at an interest rate of 23.04 percent, secured by their residence, from Pacific Finance Consumer Discount Company. Of the $5,000 amount, $502.72 was applied towards credit insurance, $891.07 was disbursed to Household Finance, $8 was paid to the recorder of deeds, and $3,598.21 was disbursed to the Gaskins. In February and March of 1981, the Gaskins borrowed $8,111.09 at an interest rate of 17.10 percent, and $14,766.14 at an interest rate of 17.64 percent respectively, from Transamerica Financial Consumer Discount Company (Transamerica); these loans were secured by their residence. Transamerica disbursed the proceeds of the February

1981 loan as follows: $3,104.84 to pay off the balance on a previous loan from Transamerica, $1,500 to Household Finance, $730.92 for insurance and recording fees, and $2,775.33 directly to the Gaskins. Proceeds of the March 1981 loan (the second mortgage) paid the balance of $7,541.42 remaining on the February 1981 Transamerica loan, $1,331.82 to Household Finance, and title insurance and recording fees of $206, leaving $5,686.90 for the Gaskins. The Gaskins used a portion of these funds to replace the broken oil burner in their home with a coal stoker and to pave the dirt driveway at their home. On July 28, 1982, the Gaskins transferred title to their house from their joint ownership to Mrs. Gaskins individually.

As of September 23, 1985, the Gaskins' property taxes for1983 and 1984 remained unpaid, and the county scheduled the property to be sold. From February through August of 1985, the Gaskins failed to make payments on their first mortgage ($161.11 per month) and were threatened with foreclosure. On March 24, 1986, Transamerica filed to foreclose on the second mortgage, since the Gaskins-had not made any payments ($234 per month) since November 17, 1985. The Gaskins' default on the second mortgage note caused the loan to become immediately due in full; the amount due on principal and interest, plus attorney's fees, was $15,192. As will be described below, funds were obtained to pay this mortgage and the foreclosure sale was averted. Mrs. Gaskins paid the 1984 and 1985 property taxes on October 27,

1986.

As of May 16, 1990, the-1988 property taxes remained unpaid, and, again, the county threatened to sell the house. On July 12, 1991, Meridian Mortgage Corporation (then the holder of the first mortgage) sent notice of its intention to foreclose if defaulted payments and late fees for the months of April through June of 1991 were not made within 30 days. On November 11, 1991, Meridian Mortgage wrote again, requesting payments for August through October of 1991. As of April 13, 1993, the property taxes for 1991 and 1992 remained unpaid.

The Gaskins have made no improvements to this house, which is in a state of disrepair. They have not purchased any new furniture since at least 1981.

### Personal Bankruptcy

On October 29, 1982, the Gaskins filed a petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The Gaskins' petition listed the IRS as a creditor of Mr. Gaskins in the amount of approximately $115,000. According to the bankruptcy petition, the Gaskins owed local taxes of $971.07 and owed Household Finance $1,650 on a loan borrowed to pay taxes. They also owed Household Finance $992.64 on a second loan, used for the purchase of a major appliance. When the Gaskins filed the bankruptcy petition, a suit was pending in the case Credit Alliance Corp. and Leasing Service

Corp. v. William and Elaine Gaskins. On March 10, 1983, the Gaskins filed to withdraw the bankruptcy petition.

Mr. Gaskins' Medical Condition and Resulting Disability Income

Mr. Gaskins suffers from several medical problems. He has had diabetes since about 1977, polycythemia,[4] and arteriosclerosis. In July of 1981, to improve circulation in his lower extremities caused by aorticiliac occlusive disease, he had arterial bypass surgery. Due to the limitations in movement imposed by this condition, Mr. Gaskins' doctor considered him to be totally disabled. However, sometime in 1984, Mr. Gaskins went to work in a coal mine. On August 14, 1984, Mr. Gaskins injured his lower back while lifting rock for the Sharp Mountain Coal Company; Mr. Gaskins has not worked since this injury. He still suffers from back pain. In early 1986, Mr. Gaskins returned to the hospital for tests, and the physician recommended that the arterial bypass surgery be repeated. That surgery was not performed until 1991. In 1993, Mr. Gaskins suffered a stroke. In December of 1993 and March of 1994, he had procedures performed on his carotid arteries, which were clogged. Mr. Gaskins continues to have problems with his legs.

In 1982, Mr. Gaskins applied for Social Security

---

[4] Polycythemia is a "condition marked by an abnormal increase in the number of circulating red blood cells". Webster's Ninth New Collegiate Dictionary (1983).

disability benefits. On May 13, 1983, Mr. Gaskins was granted benefits fora period of disability from July 3, 1981, through December 30,1982. After his 1984 accident in the coal mine, Mr. Gaskins appealed the cessation of his benefits. On August 5, 1986, the Social Security Administration issued its decision that Mr. Gaskins had continued to be disabled since 1982. In October of 1986, Mr. Gaskins received a lump-sum payment of $17,282.88 of retroactive Social Security disability income. Mrs. Gaskins received two checks in the amounts of $2,032.50 and $4,065 as retroactive payments herself and for her children, respectively. Mr. Gaskins used his lump-sum award towards the mortgages to avert the threatened foreclosures on the family home. Beginning in October of 1986, the family received monthly Social Security income of $693, from which $15.50 in medical insurance premiums was deducted. The family continues to receive Social Security income in the amount of $1,078 monthly for the benefit of the Gaskins and their daughter, Sharon.

Mr. Gaskins also received Workers' Compensation as a result of his mining accident. On July 11, 1986, Mr. Gaskins requested that his Workers' Compensation benefits be commuted to enable him to pay the second mortgage and prevent foreclosure on the home. In December-of 1986, a lump-sum payment of $74,000 was approved, from which $7,500-in attorney fees was deducted. Some of the remaining funds were used to pay off the second mortgage, taxes, and other past due bills.

Health Insurance

From 1982 until 1986, the Gaskins family had no medical insurance. Beginning in October of 1986, when Mr. Gaskins was approved for his retroactive Social Security payments, he received Medicare insurance coverage;[5] his hospital insurance coverage was effective retroactive to January of 1984. These insurance benefits applied to Mr. Gaskins only, not to the other members of his family. During 1989 to 1991, the Gaskins received several past due notices related to medical charges. On November 6, 1990, Mrs. Gaskins was approved for public assistance which entitled her to free medical care. Mrs. Gaskins' secretarial job at the Schuylkill County Courthouse, which she began in May of 1992, now provides medical insurance for the Gaskins and their daughter.

Other Resources and Assistance Received

During the early 1980's, Mrs. Gaskins' father gave them money. Mr. Gaskins' sister gave them several hundred dollars. The Gaskins did not repay this money.

In 1982, the Gaskins sold a piece of undeveloped real property for $7,500. The Gaskins had purchased this 5 1/2-acre property in 1970 for $200 at a tax sale. Of the proceeds from

---

[5]It appears that Mr. Gaskins did not elect to take the supplemental medical insurance coverage retroactive to Jan. 1984 which was made available for a cost of $500.70. This cost could be paid in a lump sum, or deducted from the next 21 monthly benefit checks.

the 1982 sale, $2,184.80 went to the IRS to be applied to Mrs. Gaskins' 100-percent-penalty debt.

On February 11, 1983, the Department of Public Welfare authorized fuel energy assistance for the Gaskins; this was used to buy coal to heat their house. The Gaskins received public welfare benefits in the amount of $183 every 2 weeks and food stamps for a period of about 2 years prior to October of 1986.

During the period 1981 through 1986, the Gaskins' daughters, Rochelle and Sharon, wore second-hand clothes. Sharon wore her older sister's clothes. In 1988 or 1989, their neighbors, the Stabinskys, gave some of their daughters' clothes to Rochelle and Sharon. Relatives also gave the girls their old clothes. Their grandparents bought them shoes, school clothes, and other school items. Their grandparents took them to amusement parks and bought them swimsuits and ice cream in the summer and toys for Christmas. Mr. Gaskins' mother gave the Gaskins family food to prepare Thanksgiving and Christmas dinners. Mrs. Gaskins' parents and Mr. Gaskins' sister also bought them food. Their neighbor, Michael Stabinsky (Mr. Stabinsky), brought them coal during the winter of 1989. Mr. Gaskins' sister also gave them coal. Mr. Stabinsky hooked up "rabbit ears" to the Gaskins' television on at least three occasions when their cable service was disconnected for nonpayment, so that the children could watch television.

On November 21, 1989, Mr. Gaskins cashed in two life insurance policies; he received only $164.74 due to $4,090.81

owed on loans made against these policies. These loans had commenced in 1976, with additional amounts borrowed in 1978, 1979, and 1981.

Lifestyle

From 1971 until 1987, Mrs. Gaskins drove a 1971 Plymouth Fury (the Fury). In 1981 and 1982, the Gaskins also owned a 1979 Dodge truck, which they financed through Chrysler Credit Corporation. In 1987, the Fury's transmission failed, and the Gaskins bought a 1984 Chevrolet Celebrity for Mrs. Gaskins. At that time, the Gaskins also owned a 1977 Cadillac and a 1973Ford. Mrs. Gaskins had the 1984 Chevrolet for only 4 days when an accident destroyed the car. Mrs. Gaskins' father then gave her a 1979 Ford Fairlane, which she was still driving at the time of the trial. In 1994, the Gaskins owned a 1982 Ford, a 1979 Ford, and a 1980 Oldsmobile.

From 1968 until the early 1980's, Mrs. Gaskins had store charge cards at the Sears and Pomeroy's department stores. She stopped using the Pomeroy's card; the Sears account was referred to a collection agency, and the card was recalled. Mrs. Gaskins made payments on the delinquent Sears account, restoring her credit rating so that during the summer of 1993, she was able to open store charge accounts again. She has never had credit cards such as Visa or American Express.

Mrs. Gaskins has never owned any expensive jewelry. The Gaskins have never gone on a family vacation, nor has Mrs. Gaskins herself gone on a vacation. The only time the Gaskins

have gone out to dinner, excluding fast food restaurants, was for their daughter's wedding rehearsal dinner. The Gaskins have never owned any expensive items such as furs, a boat, or race horses. The Gaskins have never had any stocks, bonds, or other investments other than that in Mr. Gaskins' companies. The Gaskins' older daughter was a senior at Kutztown University at the time of the trial. Her education was financed primarily by loans, grants, and a scholarship. The Gaskins contributed only $300 to $400 per year for her college education.

### Petitioner Sabina A. Quinn

### Background

Mrs. Quinn was born on November 25, 1925. She graduated from high school in 1943 and began working shortly thereafter. She received no further formal education or training. Except for 5 months of unemployment during 1988, Mrs. Quinn was in the work force almost continuously from 1943 until June of 1994, when she stopped working due to an accident. For nearly all of this 50-year period, Mrs. Quinn has worked as a legal secretary. From 1988 until June of 1994, she worked part time, even though she was in her 60's and receiving Social Security retirement income. Mrs. Quinn continued working in her later years to earn money for her car payments of $300 per month, for her medical insurance costs of $547 every 2 months, and for spending money.

The Quinns were married in 1947, and, as of the trial in this case, were still married. In 1955, they moved in with Mrs.

Quinn's parents, the Angelos. The Angelos continued living in the house and were living there until at least 1994. At some point, title to the property was transferred from the Angelos to the Quinns. Mrs. Quinn has lived in this house for all but 8 years of her life. The house is one half of a duplex, with three bedrooms, one bathroom, and a small yard. Mrs. Quinn has paid for maintenance such as new windows, siding, shutters, and brickwork; however, there have been no material alterations or additions to the house. During 1980, the Quinns paid off one mortgage with payments that year totaling $1,657.71. In the same year, they obtained a new mortgage in the amount of $3,200. The Quinns have two daughters, Patricia Miller (Patricia) and Linda Greis (Linda), who were 45 and 35 years of age, respectively, at the time of the trial. Patricia attended Bloomsburg University and Albright College; she also did post graduate work at Bloomsburg. From 1971 to 1975, and from October of 1977 to June of 1984, Patricia lived with the Quinns. During the latter period, Patricia did not pay rent but assisted with the household expenses. In 1975, when Patricia married for the first time, and in 1984, when Patricia remarried, the Quinns did not contribute towards the wedding or reception expenses.

Linda attended college with the assistance of student loans and earnings from her part-time jobs; she was graduated from the University of Delaware in 1981. Patricia helped Linda with rent and other college expenses. In August of 1982, Linda moved to

Germany to be with her husband; she lived there for 3 or 4 years. While in Germany, Linda had a child and thereafter worked as a teacher at a military installation.

### Financial Responsibilities

Mrs. Quinn was responsible for paying the family bills with her own or Mr. Quinn's funds, balancing the checkbook, and handling the family bank accounts. Mr. Quinn gave Mrs. Quinn his West Pine paychecks which she deposited into one of their accounts. She also prepared the Quinns' Federal income tax returns for the years at issue.

### Knowledge of West Pine's Operations

Mrs. Quinn had no knowledge of West Pine's operations or financial obligations other than what she garnered from the West Pine checks she wrote out under Mr. Quinn's direction. Mrs. Quinn was unaware of West Pine's customers, suppliers, or creditors. From writing out those checks, Mrs. Quinn knew West Pine had employees by the names of Devers and Hobbs, in addition to Mr. Quinn and Mr. Gaskins. When she did not receive his paycheck from Mr. Quinn, she thought that he had not been paid. She thought that Mr. Quinn did not always receive his paycheck on time, because he paid the other men first and then himself when sufficient funds were available. Other than his paychecks Mrs. Quinn knew of no other funds Mr. Quinn received from West Pine.

Mrs. Quinn never visited any West Pine work sites. Mrs.

Quinn never attended any meetings related to West Pine. She was not an officer or director of the corporation. She did not know whether she was listed as a shareholder.[6]

Mrs. Quinn knew Mr. Quinn was the secretary of West Pine. During the years 1979 through 1981, she knew Mr. Quinn visited the Pottsville IRS office, but she did not know the purpose of his visits. She was familiar, with that IRS office and with Mr. Clark from her own work responsibilities with the law firm, and she knew Mr. Quinn had to file West Pine's quarterly payroll tax returns there. Mrs. Quinn did not learn of West Pine's tax problems until she was called to testify at her husband's criminal trial in Philadelphia in 1987.

Credit Alliance Action and Aftermath

On June 14, 1982, Credit Alliance Corporation (Credit Alliance) entered a default judgment against the Quinns in the United States District Court for the Eastern District of Pennsylvania on the basis of the Quinns' personal guarantees of payment of West Pine equipment lease/purchases. Credit Alliance also entered this judgment in the Court of Common Pleas of Schuylkill County, Pennsylvania, on September 7, 1982. Mr. Quinn had signed Mrs. Quinn's name to the guarantee without her

---

[6]In 1984, after the years before the Court, two men from Philadelphia appeared in her home and insisted that she sign a blank stock certificate for West Pine. Mrs. Quinn did not wish to sign without contacting an attorney but did so under pressure from these men and Mr. Quinn. She did not know the purpose of this certificate. No evidence of the certificate or its purpose was presented at trial.

permission or knowledge. Mr. Quinn had been served with a summons regarding the Credit Alliance action, but Mrs. Quinn did not learn about it until a month later.

Mrs. Quinn then hired an attorney to defend her in this Credit Alliance matter and paid him a retainer of $5,000. Mrs. Quinn was ultimately relieved of liability for the Credit Alliance debt. Mrs. Quinn was so distressed by this incident that she contemplated divorcing Mr. Quinn. She was afraid that Credit Alliance would attempt to take her home and the assets for which she and Mr. Quinn had worked hard and scrimped and saved over a lifetime. She felt Mr. Quinn was destroying their life together by not making her aware of what he had done and by jeopardizing their life savings. The Quinns did not get a divorce, but instead they agreed to transfer their joint assets to Mrs. Quinn or to Mrs. Quinn jointly with one or the other of their two daughters. Since that time the Quinns' relationship has been strained. At the trial, Mrs. Quinn was still visibly upset by this episode in their lives.

Thus, in December of 1982, the Quinns transferred title to three undeveloped Schuylkill County lots to Mrs. Quinn's name alone. The Quinns also transferred title to their house into the names of Mrs. Quinn and Patricia. Joint bank accounts were closed or title transferred; none of these accounts contained any unusually large amounts or any deposits from unknown sources. At the time of these various transfers, Mrs. Quinn was

not aware of any tax problems of West Pine and was not aware of any tax problems that she and her husband might have in regard to West Pine. Mr. Quinn retained the insurance policies in his name through the Prudential Insurance Company of America (Prudential Insurance) and the Franklin Life Insurance Company.

As of the time of the trial, the Quinns had a joint checking account and two safe deposit boxes.

Mrs. Quinn's Assets and Other Income

The Quinns have had bank passbook savings accounts since at least 1951, and they have contributed to them regularly and accrued interest on these accounts over the ensuing years. Accounts were held in the names of Mrs. Quinn, the Quinns jointly, Mrs. Quinn and Patricia, Mrs. Quinn and Linda, and Linda and Patricia. Throughout the years, amounts were transferred from one family account to another; accounts were closed and new ones opened.

As of December of 1978, the Quinns had accumulated at least $30,974.55 in their bank savings accounts. Of this amount, $7,480.01 was in Mrs. Quinn's account at Home Savings Association of Pennsylvania (Home Savings). The savings account the Quinns held jointly at American Bank and Trust (American) contained $23,494.54.

Periodically during the 1970's, Mrs. Quinn purchased Government Savings bonds (Series E or EE bonds) with face values of $50 and $100 in the names of herself and Patricia. During

1981 to 1983, Mrs. Quinn cashed in and rolled over some of those savings bonds into H or HH bonds. For at least the years 1984 through 1987, 1990, and 1991, interest of $600 per year was earned on Series H or HH savings bonds held in the names of Mrs. Quinn and Linda and another $b00 per year on Series H or HH savings bonds held in the names of Mrs. Quinn and Patricia.

The Quinns owned Certificates of Deposit (CD's). Mrs: Quinn purchased CD's, some in her name only and some jointly with her children. Mrs. Quinn and Patricia had a money market savings account they opened in 1983. On August 30, 1984, Mrs. Quinn and Patricia received $13,365 from the sale of the three undeveloped lots. On January 25, 1985, Mrs. Quinn deposited $1,997.91, the proceeds from cashing in a life insurance policy, into the checking account she had with Patricia.

The Quinns took IRA deductions on their Federal income tax returns as follows: 1979 ($1,500), 1980 ($1,500), 1981 ($1,500). No evidence was presented as to where these contributions went, or to whose credit. During later years, Mrs. Quinn made at least the following contributions to her IRA's: 1984 ($2,000), 1985 ($2,000), 1988 ($1,500). As of September 30, 1985, Mrs. Quinn had an investment in the T. Rowe Price New Income Fund ,through her employer's retirement plan worth $1,748.44. On March 15, 1989, a check was written to Mrs. Quinn from her employer's pension plan in the amount of $20,954.95. On May 12, 1989, Mrs. Quinn rolled over this distribution into an IRA at Prudential

Bank and Trust Company (Prudential Bank),[7] which consisted of one IRA CD for the same amount.

In 1990, Mrs. Quinn cashed in a Prudential Insurance annuity, receiving $2,411.71. In December of 1991, Mrs. Quinn received a partial distribution in the amount of $2,500 from the ABA Members Retirement Program. Prudential Bank issued a distribution of $2,250 from Mrs. Quinn's IRA CD on May 26, 1992. During 1993, Mrs. Quinn received distributions totaling $1,350 from the Prudential Bank IRA, CD. During 1993, she also received $37,527, in distribution of all of the funds in one of her employer plans; that fund had earlier been in another such employer plan.

On March 30, 1993, the Quinns had a total of $106,014.48 in bank accounts (mostly savings), Keogh plans, and IRA's and $30,566.86 in various Government savings bonds. The IRA accounts, which belonged to Mrs. Quinn, totaled $85,314.81. The bank account funds, with the exception of $1,433.62 held jointly by Mrs. Quinn and Mr. Quinn, were held by Mrs. Quinn alone or by Mrs. Quinn and one or the other of their daughters. The savings bonds were held jointly by Mrs. Quinn and one of her daughters or grandchildren, and were purchased, or rolled over from purchases, in the 1970's. Over 40 years of financial records

---

[7]The Prudential Bank and Trust Company later became known as The Prudential Savings Bank or The Prudential Bank. We will use the term "Prudential Bank" to refer to this banking institution throughout this opinion, regardless of its full name at the time being discussed.

showed no unusual increases in the Quinns' assets, just a steady accumulation of savings.

Mr. Quinn's Income

Mr. Quinn has not been employed since 1982, with the exception of a short period of time during 1984 when he worked for Sharp Mountain Coal Company. Mr. Quinn incurred a work-related injury on August 9, 1984. On December 31, 1985, State Workmen's Insurance Fund sent him a check in the amount of $13,046.97, representing compensation for August 9, 1984 through January 16, 1986, less attorney fees. Thereafter, Mr. Quinn received a disability check of $323.32 every two weeks. In 1982, Mr. Quinn was already 62 years old and eligible to collect Social Security Retirement benefits. As of March 30, 1993, Mr. Quinn's monthly income from Worker's Compensation was $746 and from Social Security $423.

In 1982, Mr. Quinn opened and made two contributions totaling $9,996.42 to his annuity account with Prudential Insurance. Mr. Quinn received a partial withdrawal dated April 7, 1983, of $1,117 from his Prudential Insurance annuity account which, with his permission, was deposited into a joint bank account belonging to Mrs. Quinn and Linda. In 1985, Mr. Quinn received $1,564.98 in retirement income from the cash surrender of a Metropolitan Life Insurance Company policy. As of April 14, 1987, the Prudential Insurance annuity contract was worth $15,588.08. On April 6, 1988, Mr. Quinn requested that this contract be distributed as a life annuity, paying 120 monthly

payments to him or, after his death, to his beneficiaries; the amount of each monthly payment is $145.47.

Lifestyle

From 1979 to 1985, Mrs. Quinn drove a Volkswagen Rabbit. Mr. Quinn may have had a pickup around that time.[4]  At the time of the trial, Mrs. Quinn drove a 1990 Volkswagen. During the years at issue, Mrs. Quinn did not purchase expensive clothing, drive expensive automobiles, or dine at expensive restaurants. Mrs. Quinn has simple tastes and has always lived a modest lifestyle. Mrs. Quinn has never owned any expensive jewelry. She has store charge cards at Boscov's and Pomeroy's department stores. The Quinns dine out less than once a month; they go to moderately priced restaurants or make use of discount coupons.

When their children were young, the Quinns took a few family vacations, staying at the beach for 4 or 5 days. The Quinns have not been on a vacation together in 27 years. In 1981, Mrs. Quinn and Linda went to the Bahamas for 5 days to celebrate Linda's college graduation.

From 1979 until the present, Mrs. Quinn has given gifts averaging $50 per month to her three grandchildren, using her own or Mr. Quinn's funds. She also gave gifts of money to her daughters. From June of 1983 through June of 1984, Mrs. Quinn made payments totaling $1,887.56 on Linda's student loans. Mrs. Quinn gave Linda $3,000 to buy a house in August of 1987; the property was titled in the names of both Linda and Mrs. Quinn. During 1989, 1990, and 1991, Mrs. Quinn assisted Linda, who was

then a single parent, in paying her bills, including her mortgage. On December 4, 1989, Mrs. Quinn paid $1,150 for plastic surgery to remove a scar from Linda's lip. Mrs. Quinn gave Linda a $500 check for Christmas in 1990. In August of 1991, Mrs. Quinn paid $700 for one of Linda's graduate school courses. In June of 1993, Mrs. Quinn gave Linda $2,000 to purchase a different house; the mortgage was issued in both of their names. Mrs. Quinn also paid $1,200 of the 1993 closing costs on the new house.

OPINION

The issues for decision in these consolidated cases are: (1) Whether Mrs. Gaskins is entitled to relief as an innocent spouse under section 6013(e), and (2) whether Mrs. Quinn is entitled to relief as an innocent spouse under section 6013(e).

Normally, spouses who have filed a joint return are jointly and severally liable for the tax due. Sec. 6013(d)(3). However, section 6013(e)(1) relieves a spouse of liability for the tax, including interest, penalties, and other amounts, attributable to the substantial understatement of tax of the other spouse, if that spouse meets the following requirements: (1) A joint, Federal income tax return was filed; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse;-(3) in signing the return, the alleged innocent spouse did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable

to hold the alleged innocent spouse liable for the deficiency attributable to such substantial understatement. Sec. 6013(e)(1).

Mrs. Gaskins and Mrs. Quinn each have the burden of proving that she meets these requirements. Rule 142(a). A petitioner who fails to meet all of the requirements of section 6013(e)(1) will not qualify for innocent spouse relief. Purificato v. Commissioner, 9 F.3d 290, 293 (3d Cir. 1993), affg. T.C. Memo. 1992-580; Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Respondent has conceded that both Mrs. Gaskins and Mrs. Quinn meet the first two requirements of section 6013(e)(1). We shall consider each petitioner in turn with respect to the remaining two requirements.

### Mrs. Gaskins

### Knowledge of the Understatement

Mrs. Gaskins argues that she had no actual knowledge, nor did she have reason to know, of any diverted receipts from West Pine or substantial understatements of tax, and therefore, she should be afforded relief as an innocent spouse. Respondent contends that Mrs. Gaskins has not established her lack of knowledge or that she had no reason to know.

A taxpayer seeking innocent spouse relief must establish that he or she in signing the return did not know, and had no reason to know, that there was a substantial understatement of

tax. Sec. 6013 (e)(1)(C). The record clearly shows that Mrs. Gaskins had no actual knowledge of any understatement of Mr. Gaskins' income and the resulting substantial understatement of tax. The question is whether she had reason to know about such understatement. A spouse has "reason to know" if a reasonably prudent taxpayer under the taxpayer's circumstances at the time of signing of the return could be expected to know the return was erroneous or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg T.C. Memo. 1988-63; Bokum v. Commissioner, 94 T.C. at 148.

A taxpayer cannot close her eyes to facts or unusual expenditures that might give her reason to know of unreported income and a substantial understatement of tax.[5] Terzian v. Commissioner, 72 T.C. 1164, 1170-1171 (1979); Mysse v. Commissioner, 57 T.C. 680, 699 (1972). If a spouse knows enough facts to be put on notice of the possibility of a substantial understatement, she has a duty to inquire further. Guth v. Commissioner, 897 F.2d 441, 444-445 (9th Cir. 1990), affg. T.C. Memo. 1987-522; Weiss v. Commissioner, T.C. Memo. 1995-70. Failure to inquire may cause knowledge of the understatement to be imputed to the taxpayer. Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989) (citing Levin v. Commissioner, T.C. Memo. 1987-67); McCoy v. Commissioner, 57 T.C. 732, 734 (1972).

Factors to be considered in determining whether the spouse had reason to know are the alleged innocent spouse's level of education; the spouse's involvement in the family's business and

financial affairs; the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and the culpable spouse's evasiveness and deceit concerning the couple's finances. Price v. Commissioner, 887 F.2d at 965; Stevens v. Commissioner, 872 F.2d at 1505; Flynn v. Commissioner, 93 T.C. 355, 365-366 (1989).

Mrs. Gaskins has a high school education. She has had no training or work experience in financial matters. Mrs. Gaskins deposited Mr. Gaskins' paychecks and many of his expense checks into her checking account which, for most of the years of their marriage, was the only account that she was aware that the Gaskins had. She was responsible for paying the family's bills. For the years at issue, the Gaskins used a tax return preparer to prepare their Federal income tax returns.

Involvement with a spouse's business may give rise to a duty to inquire into the activities of that business. See Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), revg. and remanding on other grounds T.C. Memo. 1984-310; Dickey v. Commissioner, T.C. Memo. 1985-478; Shapiro v. Commissioner, T.C. Memo. 1986-142. Mrs. Gaskins knew little about West Pine's operations; however, she knew that Mr. Gaskins wanted to list her as an officer of West Pine and to use her name to sign West Pine's checks. Mr. Gaskins had used Mrs. Gaskins' name to incorporate the second roofing company and had named her as its president, because the outstanding tax debts from the first

roofing company precluded Mr. Gaskins from conducting business in his own name. Likewise, Mr. Gaskins used Mrs. Gaskins' name in running West Pine. However, knowledge of these facts would not alert Mrs. Gaskins as to any unreported income Mr. Gaskins received from West Pine.

The evidence is contradictory as to whether and when Mrs. Gaskins was listed as an officer of West Pine.[6] Regardless, Mrs. Gaskins was not assigned any duties and was not involved in the operation of West Pine. If she was an officer, she was an officer in name only, and not charged with any special duty to inquire because of any office to which she may have been named. See Bell v. Commissioner, T.C. Memo. 1989-107 (wife was shareholder and on board of directors, but had no authority); Carter v. Commissioner, T.C. Memo. 1977-322 (wife's only duty as secretary was to sign stock certificates at her home).

Mrs. Gaskins had signatory authority over the West Pine checking account. The mere fact of having signatory authority is insufficient to charge Mrs. Gaskins with reason to know of the understatement of Mr. Gaskins' income from West Pine. See Porter v. Commissioner, T.C. Memo. 1991-561. Mrs. Gaskins' name was being signed to West Pine checks by Mr. Quinn, beginning in December of 1979, and Mrs. Gaskins knew this from Mr. Gaskins' paychecks and expense checks that she endorsed. Yet, we do not believe that had Mrs. Gaskins signed the checks personally she would have known any more about West Pine's operations and the diverted receipts, or that further investigation was warranted.

First, since West Pine did not have an office, Mrs. Gaskins would have signed these checks at her house or that of the Quinns, not at the mining site where she might have witnessed any of the business activities. Second, she would have signed the checks in blind compliance with Mr. Gaskins' or Mr. Quinn's instructions, just as she allowed them to sign her name. Third, given Mrs. Gaskins' lack of knowledge of the mining business, lack of knowledge of West Pine's activities specifically, and lack of experience with corporate bookkeeping, it is unlikely that information presented in the checkbook would have aroused her suspicions. See Guth v. Commissioner, 897 F.2d 441 (9th Cir. 1990) (wife who signed organization's checks under husband's instruction held to have no reason to know of understatement); Coleman v. Commissioner, T.C. Memo. 1988-538 (wife who had access to business books-for limited period and who had no understanding of bookkeeping system held to have no reason to know). Mrs. Gaskins' knowledge of West Pine's withholding tax problem in late 1981 did not put Mrs. Gaskins on notice of the possibility of diversion of corporate receipts. West Pine's failure to pay the withheld employment taxes to the IRS and the fact that Mr. Gaskins periodically failed to give his paycheck to her would have suggested that West Pine had no money, not that Mr. Gaskins was diverting corporate receipts.

Mrs. Gaskins presented evidence about the lack of expenditures on household repairs, furnishings, clothes, or vacations. This evidence demonstrated the Gaskins' inability to

make timely payments on many of their financial obligations and their efforts to avert foreclosure by their creditors. Nothing in the Gaskins' spending habits and lifestyle would have aroused Mrs. Gaskins' suspicions. She was living at or below the poverty level.

Perceived evasiveness of the culpable spouse may trigger a duty to inquire. Stevens v. Commissioner, 872 F. 2d at 1505; Park v. Commissioner, T.C. Memo. 1993-252, affd. 25 F.3d 1289 (5th Cir. 1994). Good communication between the spouses may support a finding that the taxpayer was aware of the understatement. Hayman v. Commissioner, 992 F.2d 1256, 1262-1263 (2d Cir. 1993), affg. T.C. Memo. 1992-228.This assumes that a nonevasive spouse is more likely than an evasive spouse to communicate-relevant knowledge to his or her spouse. Conversely, a taxpayer who is unaware of being misled by the other spouse may not have reason to know of the understatement or a duty to inquire as to the possibility of an understatement. Guth v. Commissioner, 897 F.2d at 444.

Mrs. Gaskins believed Mr. Gaskins to be trustworthy. In our view, Mr. Gaskins, while not evasive, just did not share information about his business activities with Mrs. Gaskins. Mrs. Gaskins was unaware of Mr. Gaskins' individual tax debts from earlier years, learned of the first roofing company's problems only when Mr. Gaskins used her name to incorporate the second roofing company, and learned of West Pine's employment

tax problems from IRS Revenue Officer Clark. At the time of signing the individual tax returns for the years 1979, 1980, and 1981, Mrs. Gaskins was not alerted to inquire further into Mr. Gaskins' business dealings.

Based on our review of these factors as applied to Mrs. Gaskins, we hold that Mrs. Gaskins did not know, and had no reason to know, of the substantial understatements of Mr. Gaskins' income when signing their Federal income tax returns for the taxable years 1979, 1980, or 1981.

### Inequity of Holding Mrs. Gaskins Liable

Mrs. Gaskins argues it is inequitable to hold her liable because she has not benefited from any unreported income, and the family has suffered many hardships. Respondent alleges that Mrs. Gaskins has not proved it would be inequitable to hold her liable.

To qualify for innocent spouse relief, the taxpayer must show that, given all the facts and circumstances, it would be inequitable to hold the taxpayer liable for the tax deficiency attributable to the substantial understatement of the other spouse. Sec. 6013(e)(1)(D). One factor to consider is whether the taxpayer seeking relief significantly benefited from the erroneous items of the other spouse, here unreported income. Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989). Normal support is not a significant-benefit. Sec. 1.6013-5(b), Income Tax Regs.; Estate of Krock v Commissioner, supra at 678-679;

Flynn v. Commissioner, 93 T.C. at 367. Normal support is determined by the circumstances of the parties. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Estate of Krock v. Commissioner, supra at 678-679; Flynn v. Commissioner, supra at 367.

Furthermore, while a meager lifestyle may negate a reason to know or that a spouse significantly benefited, the Court of Appeals for the Third Circuit[87] has indicated that such a lifestyle need not lead to the conclusion that it is inequitable to hold the spouse liable for the tax, particularly where assets have accumulated for the spouse's later use. Purificato v. Commissioner, 9 F.3d at 296.

From a financial standpoint, the Gaskins have lived a bleak existence. They have had a history of borrowing to pay for consumer items and being delinquent on their debts. Other than their house and old automobiles, the Gaskins have no assets.

Respondent cites Sonnenborn v. Commissioner, 57 T.C. 373 (1971) and Terzian v. Commissioner, 72 T.C. 1164 (1979), for the proposition that Mrs. Gaskins has not met her burden of showing she did not benefit, since she has not accounted for the use of the diverted income. In Sonnenborn v. Commissioner, Mrs. Sonnenborn, the treasurer of the corporation from which the omitted income derived, knew of the payments from the

---

[8]An appeal in this case would lie to the Court of Appeals for the Third Circuit.

corporation to the taxpayers. She failed to prove that she did not know, or have reason to know, such payments were income, rather than the loans the taxpayers alleged them to be. Since Mrs. Sonnenborn did not provide any information as to the use of these payments, this Court would not speculate and held that she did not establish that she did not benefit. In Terzian v. Commissioner, the taxpayer did not know the source of funds in a bank account transferred to her. This Court, therefore, assumed the account contained funds from the omitted income. However, since the amount was considered to be for the taxpayer's ordinary support, this Court found she did not significantly benefit.

Mrs. Gaskins had no knowledge of any unreported payments to her husband, nor did she receive any unexplained benefits or assets. It is impossible for her to explain something she did not know about. Her burden is to show she did not benefit. It is clear from the record that Mrs. Gaskins received no benefit from the omitted income.

Another factor to consider is whether the spouse seeking relief had been deserted by, or divorced or separated from the culpable spouse. Sec. 1.6013-5(b), Income Tax Regs. Yet, this is only one of the factors to be considered, and section 6013(e) relief is not limited to spouses whose marriages have ended. Mysse v. Commissioner, 57 T.C. at 700. Mrs. Gaskins continues to

be married to Mr. Gaskins, a fact which neither helps nor hinders her case.

A third factor is whether probable future hardships would be visited upon the innocent spouse if she is not relieved of liability. Sanders v. United States, 509 F.2d at 171 n. 16. Mrs. Gaskins has argued that the hardships the family has suffered due to Mr. Gaskins' disability and the previous lack of medical coverage make it inequitable to hold her liable for the deficiency. The Court of Appeals for the Third Circuit has stated that hardships which do not affect tax liability do not bear a relationship to the innocent spouse issue. Purificato v. Commissioner, 9 F.3d at 297. Instead, we must consider the hardship to the spouse seeking relief if made to share the tax liability and whether that spouse would have to pay the tax out of her own assets. Id. at 296-297. If Mrs. Gaskins were made to share Mr. Gaskins' tax liability, her only asset, their house, would be used to help satisfy the tax. That house was acquired long before the years involved in this case. Also the funds to avert the threatened foreclosure on the mortgages on that house came from Mr. Gaskins' disability payments under Worker's Compensation and Social Security, not from any unreported income from West Pine. Since Mrs. Gaskins has derived no benefit or assets from Mr. Gaskins' omitted income, it would be inequitable for Mrs. Gaskins to be required to pay the tax.

Given these facts and circumstances, we conclude that it would be inequitable to hold Mrs. Gaskins liable for the deficiencies in tax arising from Mr. Gaskins' understated income for the taxable years 1979, 1980, and 1981.

Mrs. Quinn

Knowledge of the Understatement

Mrs. Quinn argues she did not know, and had no reason to know, of any substantial understatements of income on the Quinns' returns. Respondent counters by stating that Mrs. Quinn has not met her burden of proof on this required element for relief. The record is clear that Mrs. Quinn had no actual knowledge of the understatement of Mr. Quinn's income. Thus, we must decide whether she had reason to know of such understatement.

Mrs. Quinn has a high school education and work experience as a legal secretary; she had no special knowledge of financial matters. She controlled the family finances. Mrs. Quinn deposited their paychecks, paid the household bills, balanced the checkbook, and managed their savings. Their savings were in passbook savings accounts, Government savings bonds, IRA accounts, employer retirement or pension plans, and certificates of deposit. She prepared the Quinns' joint tax returns for the years at issue.

Mrs. Quinn was not familiar with or involved in the operations of West Pine. She was not an officer or director.

Occasionally, she wrote out West Pine checks under Mr. Quinn's direction, for his signature. What knowledge she had of West Pine's activities was limited to information gathered from this ministerial duty. As underscored by Mrs. Quinn's strong emotional reaction to recalling the events related to the Credit Alliance suit, even after the passing of 12 years, she had-no awareness of any of Mr. Quinn's business activities that would give rise to personal liability prior to her discovery of that matter in June of 1982, after the years involved in this case. Up until that time, Mrs. Quinn had trusted Mr. Quinn and had no reason to question his actions. See Pietromonaco v. Commissioner, 3 F.3d 1342 (9th Cir. 1993), revg. T.C. Memo. 1991361 and T.C. Memo. 1991-472 (Supplemental Opinion). Moreover, even if she had learned of the Credit Alliance matter before the filing of their 1981 individual tax return, that would not have alerted her to the possibility that Mr. Quinn had received unreported income from West Pine. If anything, that lawsuit, plus Mr. Quinn's apparent failure to receive his regular paychecks from West Pine, would have suggested that West Pine had no money, not that Mr. Quinn was diverting corporate receipts.

Mrs. Quinn has maintained a moderate lifestyle, with no lavish expenditures. For most of her married life, she has lived in the house purchased and occupied by her parents. She and her husband have worked their entire adult lives, regularly setting

aside money into passbook savings accounts, Government savings bonds, CD's, and retirement plans for themselves and their children. Mrs. Quinn has assisted her children financially when needed, the largest sum at any one time being $3,000 to help her younger daughter purchase a house. Nothing in the record indicates an increase in spending or a large increase in assets during or after the years at issue.

Based on these facts, we hold that Mrs. Quinn did not know and had no reason to know of any understatements of income on the Quinns' Federal income tax returns for the taxable years 1979, 1980, or 1981.

### Inequity of Holding Mrs. Quinn Liable

Mrs. Quinn contends that it would be inequitable to hold her liable for the tax deficiency arising from the understatements because she has not benefited from the omitted income. Respondent's position is that it would not be inequitable, since Mrs. Quinn has not proved she did not benefit.

Nothing suggests a significant benefit accrued to Mrs. Quinn as a result of the understatement of Mr. Quinn's income. Mrs. Quinn continued her usual frugal spending and savings habits. See Dakil v. United States, 496 F.2d 431 (10th Cir. 1974). The large volume of financial documents submitted by Mrs. Quinn fails to indicate any large or unusual amounts being deposited into her accounts, or into those she previously held

with Mr. Quinn. The majority of her assets reside in her law firm retirement plans, and are attributed to her earnings over the many years of her 50 year participation in the work force. The assets accumulated in the course of the Quinns' normal working life do not derive from the omitted income and are not a significant benefit.

As with Mrs. Gaskins, respondent argues that Mrs. Quinn must account for the diverted income. She cannot account for something she knows nothing about. See our discussion of this requirement as to Mrs. Gaskins, above. As with Mrs. Gaskins, we reject respondent's argument. Mrs. Quinn knew of no diverted funds, had no reason to know, of any diverted funds, and possessed no assets in excess of those accrued in the course of ordinary support and a lifetime of steady savings. Mrs. Quinn has amply demonstrated that she derived no benefit from any unreported income of her husband.

The Quinns remain married, although their relationship has suffered. During 1982, when learning of the Credit Alliance suit, Mrs. Quinn considered getting a divorce. Her confidence in Mr. Quinn was shaken; she felt her financial security, for which she had worked and scrimped and saved her entire life, being threatened. Rather than pursue divorce proceedings, the Quinns agreed that their joint assets, including the house given to them by Mrs. Quinn's parents, be transferred to Mrs. Quinn, either in her name alone or jointly with one or the other of

their two daughters. Remaining in the marriage, however, does not preclude Mrs. Quinn from relief.

Should liability be imposed on Mrs. Quinn, the debt would be paid from her assets, primarily her retirement funds and the house given to her by her parents. This would be inequitable since she did not benefit from Mr. Quinn's omitted income. Given all the facts and circumstances, we conclude that it would be inequitable to hold Mrs. Quinn liable for the deficiencies in tax arising from Mr. Quinn's understated income for the taxable years 1979, 1980, and 1981.

We hold that both Mrs. Gaskins and Mrs. Quinn are entitled to innocent spouse relief under section 6013(e).

Based on the concessions and the above holdings,

<u>Decisions will be entered for petitioners Elaine Gaskins and Sabina A. Ouinn on the innocent spouse issue for 1979, 1980, and 1981</u>.

<u>Decisions will be entered for respondent on the deficiencies in tax for 1979, 1980, and 1981, and the addition to tax for fraud for 1979 and 1980 as to petitioners William C. Gaskins and Pasquale T. Quinn.</u>